IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

BARBARA WARD, JOSEPH GARCIA,
ROBIN LYNN, TIMOTHY MORRIS,
DAVID READING, and PHILIP WILTON,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

THELADDERS.COM, INC.

Defendant.

Civil Action No. 1:13-cv-01605-JGK

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Dated: Sept. 4, 2013

**BURSOR & FISHER, P.A.**

Scott A. Bursor (SB1141)
Joseph I. Marchese (JM1976)
Neal J. Deckant (ND1984)
Yitzchak Kopel (YK5522)
888 Seventh Ave
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
Email: scott@bursor.com
        jmarchese@bursor.com
        ndeckant@bursor.com
        ykopel@bursor.com

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I. PLAINTIFFS STATE A CLAIM FOR BREACH OF CONTRACT ............................... 2

    A. Defendant Breached Contractual Promises That Were Expressly
        Stated In Plaintiff Morris's Terms Of Use Agreement ............................................ 2

    B. Defendant Breached Contractual Promises That Were Incorporated
        Into Plaintiffs' Agreements ..................................................................................... 4

    C. Defendant Was Obligated To Honor Its $100k+ Promise Under
        The Covenant Of Good Faith And Fair Dealing Implicit In The
        Agreement ............................................................................................................... 9

    D. Defendant's "Disclaimer Of Warranties" Is Irrelevant And Did Not
        Permit Defendant To Breach Its Contract .............................................................. 10

    E. Defendant Misinterprets The "Limitation Of Liability" Section Of
        The Agreement ....................................................................................................... 12

    F. Even According To Defendant's Misinterpretations, The Purported
        Exculpatory Clauses Would Still Not Relieve Defendant Of
        Liability ................................................................................................................. 13

        1. Exculpatory Clauses Are Unenforceable Against
            Intentional Wrongdoing .............................................................................. 14

        2. The Exculpatory Clauses Were Procedurally And
            Substantively Unconscionable ................................................................... 15

        3. The Exculpatory Clauses Cannot Prevent Rescission Of
            The Agreement ........................................................................................... 16

II. PLAINTIFFS SUFFICIENTLY ALLEGE CLAIMS UNDER THE
    CONSUMER PROTECTION LAWS ............................................................................ 18

    A. The Out-Of-State Plaintiffs Have Standing To Assert A GBL § 349
        Claim ..................................................................................................................... 18

    B. Defendant's Statute Of Limitations Arguments Are Wrong ................................. 19

C.      Defendant Violated The Consumer Protection Laws Of New York, California, And Washington As To The Premium Member Plaintiffs .................................................................................................... 21

        1.      Defendant's Misrepresentations Were Misleading ....................................21

        2.      Defendant Did Not "Disclose" Its Deceptive Business Practices ..................................................................................................23

        3.      Plaintiffs Allege They Saw Defendant's Misrepresentations ...................24

III.    DEFENDANT FRAUDULENTLY INDUCED THE RESUME PLAINTIFFS INTO PURCHASING RESUME REWRITING SERVICES ................... 25

IV.     PLAINTIFFS STATE CLAIMS FOR UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED ...................................................................................... 29

CONCLUSION ........................................................................................................................ 29

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Atlantic Mut. Ins. Co. v. Poseidon Schiffahrt, G.m.b.H.*,
  313 F.2d 872, 1963 AM.C. 665 (7th Cir. 1963) ............................................................ 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ............................................................................................ 27

*Broadhead Ltd. Partnership v. Goldman, Sachs & Co.*,
  2007 WL 951623 (E.D. Tex. Mar. 26, 2007) ................................................................ 17

*BTEC Turbine, LP v. Conn. Light & Power Co.*,
  2007 WL 3046257 (D. Conn. Oct. 17, 2007) ................................................................ 17

*Canfield v. Reynolds*,
  631 F.2d 169 (2d Cir. 1980) .......................................................................................... 16

*Cook, Perkiss, & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
  911 F.2d 242 (9th Cir. 1990) ........................................................................................ 26

*D & N Prop. Management & Dev. Corp., Inc. v. Copeland Companies*,
  127 F. Supp. 2d 456 (S.D.N.Y. 2001) ............................................................................ 4

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
  352 F.3d 775 (2d Cir. 2003) .......................................................................................... 15

*Dalton v. Educ. Testing Serv.*,
  663 N.E.2d 289 (N.Y. 1995) ............................................................................................ 9

*Day v. AT&T Corp.*,
  63 Cal. App. 4th 325 (1998) .......................................................................................... 22

*Derbaremdiker v. Applebee's Intern., Inc.*,
  Sept. 26, 2012 ................................................................................................................ 23

*Deutsche Alt-A Sec. Mortg. Loan Trust, Series…*,
  __ F. Supp. 2d __, 2013 WL 3863861 (S.D.N.Y. Jul. 24 2013) .............................. 14, 18

*Diacakis v. Comcast Corp.*,
  2012 WL 43649 (N.D. Cal. Jan. 9, 2012) ...................................................................... 24

*Donnelly Marketing v. Lionel Sosa, Inc.*,
  716 S.W.2d 598 (Tex. Ct. App. 1986) ............................................................................ 11

*Ellington v. Sony/ATV Music Publ'g LLC,*
    85 A.D.3d 438 (1st Dep't 2011) ...................................................................... 17

*Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.,*
    2007 WL 950134 (S.D.N.Y. Mar. 28, 2007) ..................................................... 10

*Federal Ins. Co. v. Mallardi,*
    696 F. Supp. 875 (S.D.N.Y. 1988) .................................................................. 26

*Fink v. Time Warner Cable,*
    837 F. Supp. 2d at 283-83 ................................................................................ 22

*Flagship West, LLC v. Excel Realty Partners, L.P.,*
    758 F. Supp. 2d 1004 (E.D. Cal. 2010) ........................................................... 17

*Gabaayzadeh v. Brafman,*
    2010 WL 6620688 (S.D.N.Y. Jun. 18, 2010) .................................................. 26

*Gaidon v. Guardian Life Ins. Co. of Am.,*
    96 N.Y.2d 201 (2001) ................................................................................. 20, 24

*Gale v. Int'l Bus. Machs. Corp.,*
    9 A.D.3d 446 (2d Dep't 2004) ......................................................................... 25

*Giller v. Oracle USA Inc.,*
    2012 WL 467323 (S.D.N.Y. Feb. 14, 2012) .................................................... 10

*Gillman v. Chase Manhattan Bank, N.A.,*
    73 N.Y.2d 1 (1988) ..................................................................................... 15, 16

*Goldbaum v. Bank Leumi Trust Co. of N.Y.,*
    543 F. Supp. 434 (S.D.N.Y. 1982) .................................................................. 14

*Goshen v. Mut. Life Ins. Co. of N.Y.,*
    98 N.Y.2d 314 (2002) ...................................................................................... 18

*Granite Partners, L.P. v. Bear, Stearns & Co.,*
    F. Supp. 2d 275 (S.D.N.Y. 1998) .................................................................... 10

*Gross v. Sweet,*
    49 N.Y.2d 102 (1979) ...................................................................................... 14

*Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC,*
    808 F. Supp. 2d 552 (S.D.N.Y. 2011) ............................................................. 10

*Highlands Ins. Co. v. PRG Brokerage, Inc.,*

    2004 WL 35439 (S.D.N.Y. Jan. 6, 2004) ........................................................................ 26

*Jofen v. Epoch Biosciences, Inc.*,
    2002 WL 1461351 (S.D.N.Y. Jul. 8, 2002) .................................................................... 9

*Jones v. Cunard S.S. Co.*,
    238 A.D. 172 (2d Dep't 1933)......................................................................................... 6

*JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*,
    2009 WL 321222 (S.D.N.Y. Feb. 9, 2009)..................................................................... 10

*Kalisch–Jarcho, Inc. v. City of N.Y.*,
    58 N.Y.2d 377 (N.Y. 1983) ........................................................................................... 14

*Keithly v. Intelius Inc.*,
    764 F. Supp. 2d 1257 (W.D. Wash. 2011)...................................................................... 22

*Kirke La Shelle Co. v. Paul Armstrong Co.*,
    188 N.E. 163, (N.Y. 1933).............................................................................................. 9

*LaSalle Bank Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005)............................................................................................ 3

*Leonard v. PepsiCo, Inc.*
    88 F. Supp. 2d 116 (S.D.N.Y. 1999).............................................................................. 7

*Lowry & Co. v. S.S. Le Moyne D'Iberville*,
    253 F. Supp. 396 (S.D.N.Y. 1966)................................................................................. 6

*Lozano v. United Cont'l Holdings, Inc.*,
    2012 WL 4094648 (N.D. Ill. Sept. 17, 2012) ................................................................ 7

*M/A–COM Sec. Corp. v. Galesi*,
    904 F.2d 134 (2d Cir. 1990)........................................................................................... 9

*Maltz v. Union Carbide Chem. & Plastics Co., Inc.*,
    992 F. Supp. 286 (S.D.N.Y. 1998)................................................................................ 11

*Mastrobuono v. Shearson Lehman Hutton, Inc.*,
    514 U.S. 52 (1995)......................................................................................................... 8

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
    85 N.Y.2d 20 (1995) ..................................................................................................... 21

*PaineWebber Inc. v. Bybyk*,
    81 F.3d 1191 (2d Cir. 1996)........................................................................................... 6

*Pelman ex rel. Pelman v. McDonald's Corp.*,
    396 F. Supp. 2d 439 (S.D.N.Y.  2005) .................................................... 24, 28

*Picture Patents, LLC v. Earopostale, Inc.*,
    2009 WL 2569121 (S.D.N.Y. 2009) ........................................................ 29

*Preira v. Bancorp Bank*,
    885 F, Supp. 2d 672 (S.D.N.Y. 2012) ...................................................... 23

*Robinson v. Match.com, L.L.C.*,
    2012 WL 3263992, (N.D. Tex. Aug. 10, 2012) ........................................ 3, 11

*Ronnen v. Ajax Elec. Motor Corp.*,
    88 N.Y.2d 582 (1996) ............................................................................ 13

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) .................................................................... 27

*Rowe v. Great Atl. & Pac. Tea Co.*,
    385 N.E.2d 566 (N.Y. 1978) ................................................................... 9

*Scholastic, Inc. v. Harris*,
    259 F.3d 73 (2d Cir. 2001) ..................................................................... 8

*Schwartz v. Nat'l Computer Corp.*,
    42 A.D.2d 123 (1st Dep't 1973) ............................................................. 16

*Search v. Bank of Am.*,
    2012 WL 454285 (W.D. Wash. Oct. 2, 2012) ......................................... 22

*Stern v. Leucadia Nat. Corp.*,
    844 F.2d 997 (2d Cir. 1988) ................................................................... 28

*Sudul v. Computer Outsourcing Services, Inc.*,
    917 F. Supp. 1033 (S.D.N.Y. 1996) ....................................................... 26

*Syncora Guarantee Inc. v. EMC Mortg. Corp.*,
    2012 WL 2326068 (S.D.N.Y. Jun. 20, 2012) ......................................... 18

*Time Warner Cable, Inc. v. Directv, Inc.*,
    497 F.3d 144 (2d Cir. 2007) ................................................................... 22

*U.S. v. Hamdi*,
    432 F.3d 115 (2d Cir. 2005) ................................................................... 3

*Universal Leasing Servs., Inc. v. Flushing Hae Kwan Rest.*,

169 A.D.2d 829 (2d Dep't 1991) ........................................................................................ 15

*Welch v. TD Ameritrade Holding Corp.*,
 2009 WL 2356131 (S.D.N.Y. Jul. 27, 2009) .................................................................. 26

*Williams v. Gerber Prods. Co.*,
 552 F.3d 934 (9th Cir. 2008) ......................................................................................... 21

*Wolff v. Rare Medium, Inc.*,
 65 F. App'x 736 (2d Cir. 2003) ....................................................................................... 3

## STATUTES

New York General Business Law § 349 ........................................................................ passim

N.Y. Civ. Prac. Law § 202 ................................................................................................... 22

## OTHER AUTHORITIES

*Williston on Contracts* .......................................................................................................... 12

## INTRODUCTION

Plaintiffs complaint asserts claims against TheLadders.com, Inc. ("Defendant" or "TheLadders") for breach of contract, rescission of contract, breach of implied covenant of good faith and fair dealing, money had and received, fraud, unjust enrichment and violations of the consumer protection laws of New York, California and Washington. Second Amended Complaint ("SAC") ¶ 9. Plaintiffs' claims are based, in part, on Defendant's broken promises and misrepresentations in its advertisements, website and Terms of Use to be "a premium job site for only $100k+ jobs." Id. ¶ 1; see also id. ¶ 78 ("the employer wrote back a one-line email reply to [Ms. Lynn]: This position is paying @ $75-80k…"); id. ¶103 ("Mr. Reading was then notified that the job did not pay $100k+. Rather, it paid between $75,000 and $80,000 'max.'"). Unlike other online job boards which are free to join, TheLadders charged a premium subscription fee to members for "hand-screen[ing] every job post and recruiter so you only see real, open $100k+ jobs in your area." In reality, however, its job postings were not hand screened. They were "scraped" from the Internet without authorization from employers or recruiters, and the employment opportunities were not for "real, open $100k+ jobs." Moreover, TheLadders had no process in place to ensure that these posted positions ever truly existed, remained open, or that they met its minimum advertised annual compensation criteria of $100k+. Id. ¶ 2.

TheLadders also promised a free "expert resume critique" for its premium members. Id. ¶ 48. However, instead of providing bona fide resume critiques as promised, TheLadders sent its members misleading form letters ending with a sales pitch for resume rewriting services, which are offered for a fee. SAC ¶¶ 49-50. Moreover, the purported "expert resume critiques" were nothing of the sort because they were issued by salespeople who were neither certified nor trained in the field of resume consulting. Id. ¶ 51.

Thus, Plaintiffs seek to recover, for themselves and all other similarly situated premium members of TheLadders, a full refund of the subscription and service fees paid for the purported $100k+ job opportunities they were promised but did not receive. Id. ¶ 9. Moreover, Plaintiffs

Lynn, Morris, and Garcia also seek to recover, for themselves and all other similarly situated members of TheLadders who paid for resume rewriting services, a full refund of fees paid to Defendant under false pretenses.  Id. ¶ 9.

Defendant has moved to dismiss Plaintiffs' claims, but its motion raises numerous issues of fact which cannot be decided at the pleading stage.  In it motion, Defendant argues it had no contractual obligation to keep its promises of performance to premium members, and that it did not violate the various consumer protection laws because, among other things, its conduct was not deceptive or misleading.  These arguments are incorrect and unavailing for the reasons set forth below.

Defendant's arguments that its purported exculpatory clauses shield it from liability are likewise incorrect.  Its "disclaimer of warranties" is irrelevant because Plaintiffs do not assert any claims for breach of warranty.  Moreover, the "Limitation of Liability" section of its Terms of Use (the "Agreement") does not shield Defendant from liability because it expressly provides that Defendant would be liable for claims asserted by Plaintiffs up to the total amount they paid Defendant in the year preceding the date of the claim.  Further, both clauses are unenforceable against Defendant's willful conduct, were both procedurally and substantively unconscionable, and are irrelevant to Plaintiffs' claims for rescission of contract.

Finally, Defendant's arguments with regard to the out-of-state Plaintiffs' lack of standing under GBL § 349 defies recent Second Circuit precedent in Cruz v. FXDirectDealer, LLC, 720 F.3d 115 (2d Cir. 2013).  And its remaining arguments concerning statutes of limitations and the pleading standard under Rule 9(b) fare no better.

## ARGUMENT

## I.    PLAINTIFFS STATE A CLAIM FOR BREACH OF CONTRACT

### A.    Defendant Breached Contractual Promises That Were Expressly Stated In Plaintiff Morris's Terms Of Use Agreement

As noted above, Plaintiff Morris was a premium member when Defendant added an express promise of performance to its Agreement promising that it "reviews each job listing" to

"ensure it meets the criteria of a $100K+ position." Defendant had a contractual obligation to keep this promise, and the SAC sufficiently alleges that they failed to do so. SAC ¶¶ 1, 2, 30, 31, 88, 90, 129-132, 134-137. At minimum, the allegations of the SAC raise factual questions concerning the breach of contract claim which cannot be decided at the pleading stage.

Defendant argues this promise was merely "a general description of services." Def's Br. at 7. That is incorrect. "In interpreting a contract under New York law, words and phrases . . . should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). Here, the plain meaning of these words is that Defendant would perform a specific, material and valuable service—that is, to review each job listing before it gets posted to ensure that the positions pay $100,000 or more per year. Promissory phrases such as this create obligations under a contract. *See U.S. v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (holding "promissory phrases introduce the key obligations created under the contract" including that the defendant "will plead guilty" and "will not file an appeal."). Defendant's cases are inapposite because unlike here, the clauses in question contain no promissory language. *See Hamdi*, 432 F.3d at 122 (clause stating that "defendant's sentence is governed by United States Sentencing Guidelines" was not a promise that defendant would not appeal); *Robinson v. Match.com, L.L.C.*, 2012 WL 3263992, at *12 (N.D. Tex. Aug. 10, 2012) (statement that website was "the service for single adults to meet each other online" was not a promise); *Wolff v. Rare Medium, Inc.*, 65 F. App'x 736 (2d Cir. 2003) ("plain language" of contract could not be read to impose obligation).

Finally, Defendant argues that its promise to "ensure" each job listing "meets the criteria of a $100k+ position" merely means it would ensure that the postings "bear[]the hallmarks of a job paying $100,000." Def's Br. at 8. Importantly, however, Plaintiffs allege that the "criteria," or measures, of a "$100k+ position" include (a) an actual, open "position," that (b) pays $100,000 or more per annum. SAC ¶¶ 90 ("Dr. Morris understood these misrepresentations to

3

mean that TheLadders actively screened all of its job postings, that all jobs listed on the site were current, authorized, and paid only $100,000 per year . . . ."), 129, 131. Therefore, at minimum, Defendant raises an issue of fact about Plaintiffs' breach of contract claim which cannot be decided at the pleadings stage.

**B.  Defendant Breached Contractual Promises That Were Incorporated Into Plaintiffs' Agreements**

Defendant's contractual promise of providing "only $100k+ jobs" was listed *at all times* on its website and was incorporated into Plaintiffs' Agreements. Defendant argues this promise was an "advertisement" rather than a contractual term. *Id.* at 11-13. That is incorrect. As detailed below, this promise constitutes an essential contract term for premium member service, and the Agreement necessarily incorporated it as such. According to Defendant's argument, the very membership fees which Plaintiffs seek to recover could also be deemed "advertisements" since Defendant's membership fees and options were not expressly listed in the body of the Agreement, but rather were listed separately on its website. This would have rendered the entire Agreement invalid for lack of a price term, which is considered an "essential term of any contract." *See D & N Prop. Management & Dev. Corp., Inc. v. Copeland Companies*, 127 F. Supp. 2d 456, 463 (S.D.N.Y. 2001) ("The amount of compensation, the 'price term,' is an essential term of any contract … In the absence of an agreement as to … compensation the purported agreement is invalid.") (internal quotations and punctuation omitted). Therefore, the Agreement certainly incorporated external contractual terms for its premium member services.

The Agreement also clearly stated its intent to incorporate additional, separate terms. While the Agreement purported to be binding on anyone "access[ing] or otherwise us[ing] the Website," it also contemplated that Defendant would offer additional services not detailed in the Agreement in exchange for fees, such as its premium member service. A section titled "Orders For Products And Services" stated:

> We may make certain products and services available to visitors and registrants of the Website…. You agree to pay in full the prices for any purchases You make….

4

Soon thereafter, a section titled "Additional Terms" stated:

> ***Certain sections or pages on the Website, or certain features or services provided thereon***, may contain separate terms and conditions, ***which are in addition to these Terms of Use***.  In the event of conflicting provisions, the additional terms and conditions will govern.

Addonizio Decl. ¶ 1, Ex. 5 at 4-5 (emphasis added).  Consistent with these provisions, and as discussed immediately above, Defendant displayed numerous essential and material contract terms for its premium member service on its website, including without limitation the prices, the membership options and the services being offered in return for the membership fees. For example, immediately upon logging on to www.theladders.com, Defendant displayed a large, conspicuous banner promising that "experts pre-screen all jobs so they're always $100k+."  SAC ¶ 24.  To become a premium member, visitors had to click a button labeled "Join The Ladders" located directly on that same banner.  Furthermore, the "Join The Ladders" button was located after the words "Exclusively $100k+ jobs."  *Id.*



Clicking the button brought visitors to the next screen, which allowed them to select the length of the membership they desired for specified prices.  Visitors then completed payment for the price specified on the website in exchange for the service listed on the website – access to pre-screened jobs that are always $100k+.

Thus, Defendant's promise to provide only pre-screened, real $100k+ jobs to its premium members was an essential contractual term for its premium member service that was duly

incorporated into the Agreement. Under New York law, "a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it." *Jones v. Cunard S.S. Co.,* 238 A.D. 172, 173 (2d Dep't 1933). No magic words are needed to incorporate a document by reference. *See, e.g., Lowry & Co. v. S.S. Le Moyne D'Iberville*, 253 F. Supp. 396, 398 (S.D.N.Y. 1966) ("It is not necessary, in order to incorporate by reference the terms of another document, that such purpose be stated in *haec verba* or that any particular language be used .... [I]t is settled doctrine that a reference in a contract to another writing, sufficiently described, incorporates that writing."). Here, by virtue of the "Additional Terms" provision, the Agreement clearly contemplated the inclusion of separate terms and conditions "on [Defendant's] Website."

The Agreement also contained another important clue demonstrating its intent to incorporate terms listed on its website. A section titled "Refunds" stated:

> All subscriptions not cancelled within this 3 day period, including four- week subscriptions, twenty-six week subscriptions, or fifty-two-week subscriptions, may be canceled by You at any time …

Addonizio Decl. ¶ 1, Ex. 5 at 4. But this is the only mention of these subscriptions of varying length in the entire internal terms of the Agreement. The only mention of the *formation* of subscriptions for these varying lengths is *on the website* (along with Defendant's promise to provide only existing $100k+ jobs). It defies common sense that the Agreement would discuss cancellation of a service without discussing its formation.

Defendant argues that in order for a term to be incorporated into a written instrument by reference it "must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." Def's Br. At 12-13 (citing *PaineWebber Inc. v. Bybyk*, 81 F.3d 1191, 1201 (2d Cir. 1996)). But Defendant does not explain why any reasonable doubt exists. As noted above, the Agreement specifically contemplated that Defendant would offer certain services for a price on its Website, and those services "contain separate terms and conditions, which are in addition to [the Agreement]." Addonizio Decl. ¶ 1, Ex. 5 at 5. The

Agreement shows a clear intent to incorporate the terms and conditions of these services and fees listed on Defendant's website.

In this regard, Defendant's cases completely miss the point. For example, Defendant cites *Lozano v. United Cont'l Holdings, Inc.*, 2012 WL 4094648 (N.D. Ill. Sept. 17, 2012). In *Lozano*, the plaintiffs sued Continental Airlines for breach of contract after their flight was delayed and they received inadequate lodging in violation of European law. 2012 WL 4094648 at *3. The plaintiffs alleged that the applicable European statute, a copy of which was posted to Continental's website, was incorporated into their contract with Continental because the "Contract of Carriage" had a clause incorporating terms "specified on any internet site." *Id.* at *4. The court rejected this argument because (1) there was an "obvious conflict" between the posted statute and the internal terms of the Contract of Carriage; (2) the statute was posted in an "out of the way spot on its website" in a "circuitous and hard-to-detect manner;" and (3) the website specifically noted that it only posted the statute because it was legally "required to" do so. *Id.* at *4-5.

The facts of *Lozano* are distinguishable from the present facts since (1) no conflict exists between the internal terms and Defendant's promise of supplying pre-screened $100k+ jobs (and, in any event, the Agreement provides that incorporated terms *govern* in the event of a conflict), (2) Defendant's promise is the first and most conspicuous thing visitors see upon accessing its website, and (3) it was clear that this promise was Defendant's contractual obligation to its premium members. The *Lozano* case would be closer to the present facts if Continental had argued it had no obligation to fly to the intended destination, since the internal terms of the "Contract of Carriage" did not explicitly require it to do so.[1]

---

[1] Defendants remaining cases stand for the irrelevant principle that advertisements are not considered contractual offers. *See Leonard v. PepsiCo, Inc.* 88 F. Supp. 2d 116, 123 (S.D.N.Y. 1999) (television commercial advertising a jet in exchange for "Pepsi points" was not an offer where jet was not listed in points catalogue or order form); *Fink v. Time Warner Cable*, 837 F. Supp. 2d 279, 285 (advertisements offering "always-on connection" with "up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up" did not create implied in fact contract claim because they did not constitute "specific, concrete, factual representations"). Here, Defendant made a specific, concrete promise of performance that it would provide access to only existing $100k+ job listings as a term of its service on the very banner Plaintiffs had to click to subscribe to a membership with it.

Defendant also argues that incorporation of terms from its website would render the Agreement "incoherent and practically meaningless" because the website was periodically revised. *See* Def's Br. at 13.[2] That is wrong. Of course, not *everything* written on Defendant's website was incorporated. But the contractual terms for the services offered on Defendant's website, such as Defendant's promise to premium members to provide access to only existing $100k+ jobs, are incorporated into the Agreement as additional terms pursuant to the "Additional Terms" clause. Moreover, Defendant's promise of "only $100k+ jobs" remained the same at all throughout the Class period. *See* SAC ¶ 23 ("At all times relevant herein, TheLadders' website … included promises of performance representing that TheLadders would provide members with "only real and open $100k+ jobs.").

Finally, while Plaintiffs contend the Agreement is unambiguous in its intent to incorporate Defendant's promise to provide only existing 100k+ jobs, it is noteworthy that, at the very least, Defendant "cannot overcome the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995). "The reason for this rule is to protect the party who did not choose the language from an unintended or unfair result." *Id.* Moreover, [t]he meaning of an ambiguous contract is a question of fact for the fact-finder." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001). After unilaterally drafting the Agreement, Defendant improperly moves the Court to interpret its language in an overly narrow and self-serving fashion.

In light of the foregoing, Defendant's motion to dismiss Plaintiffs' breach of contract claim should be denied.

---

[2] Ironically, however, Defendant has also attached five different versions of the Agreement – each with revisions. In fact, the Agreement stated: "TheLadders reserves the right, at any time, to modify, alter, or update these Terms of Use without prior notice. Any such changes will become effective immediately upon being posted on the Website." Addonizio Decl. ¶ 1, Exh. 5 at 1.

**C.      Defendant Was Obligated To Honor Its $100k+ Promise Under The Covenant Of Good Faith And Fair Dealing Implicit In The Agreement**

Assuming Defendant had no duty to provide only real $100k+ jobs listings under the express terms of the Agreement or the incorporation clause – which it did – Defendant certainly had such a duty under the covenant of good faith and fair dealing implicit in the Agreement. New York law recognizes as implicit in every contract "a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995) (citation omitted); *see also Jofen v. Epoch Biosciences, Inc.*, 2002 WL 1461351 at *8 (S.D.N.Y. Jul. 8, 2002). This covenant incorporates "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978) (citation and quotation marks omitted). The covenant includes a pledge that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton*, 663 N.E.2d at 291 (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933)); *see also M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (per curiam).

Here, among other things, the Agreement specifically contemplated that Defendant would provide its members with services in exchange for payment of fees. *See* Addonizio Decl. ¶ 1, Ex. 5 at 4 ("We may make certain products and services available to Users and Members…. You agree to pay in full the prices for any purchases You make…"). And a primary benefit of Defendant's premium member service was access to only existing $100k+ jobs. SAC ¶ 130. A reasonable person would thus be justified in understanding that Defendant would not undermine this purpose. But Defendant breached its duty by deliberately "providing and presenting, through its website, unscreened job posts for positions which no longer existed or did not pay $100,000 a year." SAC ¶ 148. This conduct "disappointed the reasonable expectations of Plaintiffs and other members of the Premium Member Class, thereby depriving them of the benefits of the Agreement." *Id.* ¶ 151.

Defendant argues this claim cannot be maintained simultaneously with Plaintiffs' breach of contract claim. Def's Br. at 15 (citing *Giller v. Oracle USA Inc.*, 2012 WL 467323 (S.D.N.Y. Feb. 14, 2012) and *Excelsior Fund, Inc. v. JP Morgan Chase Bank, N.A.*, 2007 WL 950134 (S.D.N.Y. Mar. 28, 2007)). But it can be maintained in the alternative. "[W]here the existence or meaning of a contract is in doubt, a party may plead a claim for breach of the covenant of good faith and fair dealing in the alternative." *Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 567-68 (S.D.N.Y. 2011). In such a case, "a plaintiff adequately states an implied covenant claim by alleging conduct that subverts the contract's purpose without violating its express terms." *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009).

Defendant also argues that this claim attempts to impose new obligations not already contained in the Agreement. Def's Br. at 15-16. But the Agreement specifically contemplated and incorporated all of the alleged contractual obligations set forth in the allegations of the SAC, as discussed *supra* §§ I.A and I.B. *See Granite Partners, L.P. v. Bear, Stearns & Co.*, F. Supp. 2d 275, 306 (S.D.N.Y. 1998) ("recognizing defendant's duty to exercise good faith in carrying out contractual obligations").

### D. Defendant's "Disclaimer Of Warranties" Is Irrelevant And Did Not Permit Defendant To Breach Its Contract

Defendant argues that performance of its contractual obligations was excused because it included a "Disclaimer of Warranties" section in the Agreement. That is wrong. Simply put, the effect of a warranty disclaimer is to disclaim *warranty*, not contractual obligations. Here, Plaintiffs allege a breach of contract – not warranty. Defendant's position that its purported warranty disclaimer can excuse it from its contractual obligations defies both hornbook law and common sense.

"A disclaimer contained in the contract of sale excludes warranties, if any outside the contract. However, a disclaimer of warranties may not preclude other statutory causes of action, or a cause of action for breach of contract separate and distinct from breach of warranty …. 77A

C.J.S. *Sales* § 463. *See also Donnelly Marketing v. Lionel Sosa, Inc.*, 716 S.W.2d 598, 603-04 (Tex. Ct. App. 1986) ("Although a disclaimer of warranty may be effective to preclude or limit one's liability under a breach of warranty cause of action it does not so operate under a breach of contract cause of action.").

The "Disclaimer of Warranties" section is clear in its scope. The first paragraph twice purports to disclaim "warrant[ies] of any kind, express or implied." Addonizio Decl. ¶ 1, Ex. 5 at 1 (uppercase in original). The third paragraph includes a longer laundry list of which causes of action it purports to bar: "No warranty of any kind, whether implied, expressed or statutory, including but not limited to the warranties of non-infringement of third party rights, title, noninfringement, merchantability, fitness for a particular purpose and freedom from defect, computer virus or other error …" *Id.* at 2 (uppercase in original). Conspicuously absent from this list are any claims asserted by Plaintiffs.

The plain language of the Agreement also makes clear the intent to distinguish between causes of action lying in contract and warranty where it states (in a different section):

> TheLadders' maximum total, aggregate liability … regardless of the cause of action (whether in **contract**, tort, **breach of warranty** or otherwise) will in no event exceed the total amount customer has paid to TheLadders within the twelve (12) month period preceding the date the claim first arose.

*Id.* (uppercase in original). Defendant's failure to include the same language in the "Disclaimer of Warranties" section makes it clear that it was not intended to cover as broad of a scope.

Defendant's cases do not dispute this. *Robinson v. March.com, L.L.C.*, 2012 WL 3263992 at *10-12 (N.D. Tex. Aug. 10, 2012), analyzed a contractual provision laying out the obligations of the parties. Unlike here, the provision in question was not a general "disclaimer of warranties." By contrast, *Maltz v. Union Carbide Chem. & Plastics Co., Inc.*, 992 F. Supp. 286, 304 (S.D.N.Y. 1998) upheld a contractual disclaimer of warranties similar to the one contained in the Agreement here to bar the plaintiff's *warranty* claims. Notably, the *Maltz* court declined to dismiss the plaintiffs' breach of contract claims. *Id.* at 299.

Finally, common sense dictates that Defendant's interpretation cannot be correct.  If a disclaimer of warranties allowed parties to disclaim all their contractual obligations, all contracts containing such disclaimers would become illusory for a lack of consideration.  Indeed, the effect of this interpretation would render the entire Agreement void.  3 *Williston on Contracts* § 7:11 ("Where no consideration exists, and is required, the lack of consideration results in no contract being formed ....").

**E.      Defendant Misinterprets The "Limitation Of Liability" Section Of The Agreement**

Defendant argues that the "Limitation of Liability" section precludes Plaintiffs from recovering their fees.  *See* Def's Br. at 13-15.  But this is a disingenuous reading of the express language of this section, which specifically permits Defendant's liability up to the total amount Plaintiffs "paid to TheLadders within the twelve (12) month period preceding the date the claim first arose."  Addonizio Decl. ¶ 1, Ex. 5 at 3 (uppercase in original).

The "Limitation of Liability" section contained three paragraphs, but Defendant's moving brief conveniently fails to address the last of these.  The first paragraph states that Defendant had no control over "the actual transaction between employers/recruiters and candidates" and could not be responsible for what transpires in such transactions:

> The Website acts as a venue for employers/recruiters to post jobs and search for candidates, and for candidates to post resumes and search for jobs. TheLadders is not involved in the actual transaction between employers/recruiters and candidates. *As a result* TheLadders has no control over User Content, quality, safety, or legality of jobs or resumes posted and makes no representations about any jobs, resumes or User Content. TheLadders shall not be responsible for any employment decisions, for whatever reason …

*Id.* (emphasis added).  The words "as a result" meant that Defendant had no control over what other parties post on its website, *because* it was not involved in the actual transactions between third parties.  Nothing in this paragraph allowed Defendant to deliberately scrape job postings from the Internet it knew nothing about and misrepresent them as existing $100k+ jobs.

The second paragraph stated that Defendant shall not be liable for damages "except as expressly provided in these Terms:"

> ***Except as expressly provided in these Terms***, in no event shall TheLadders, its directors, officers, employees, agents, suppliers, licensors or any third parties appearing on the Website be liable for any damages whatsoever …

*Id.* (emphasis added). As contemplated by the second paragraph, the third paragraph expressly provides for Defendant's liability arising out of services provided on its website:

> THELADDERS' MAXIMUM TOTAL, AGGREGATE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THE WEBSITE AND ANY INFORMATION OR SERVICES PROVIDED THEREIN, REGARDLESS OF THE CAUSE OF ACTION (WHETHER IN CONTRACT, TORT, BREACH OF WARRANTY OR OTHERWISE), WILL IN NO EVENT EXCEED THE TOTAL AMOUNT CUSTOMER HAS PAID TO THELADDERS WITHIN THE TWELVE (12) MONTH PERIOD PRECEDING THE DATE THE CLAIM FIRST AROSE.

*Id.* (uppercase in original). Defendant's brief conveniently fails to mention the third paragraph of the "Limitation of Liability" section. Defendant's argument renders this paragraph, and the introductory clause of the second paragraph, superfluous in contradiction of accepted norms of contractual interpretation and construction. *See Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y.2d 582, 589 (1996). ("We have long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect.").[3]

**F.      Even According To Defendant's Misinterpretations, The Purported Exculpatory Clauses Would Still Not Relieve Defendant Of Liability**

Even if Defendant were correct in its interpretations of the Agreement's "Disclaimer of Warranties" and "Limitation of Liability" sections, these sections would still not relieve it of liability because (1) exculpatory clauses are ineffective against willful conduct under New York law; (2) both sections would be both procedurally and substantively unconscionable; and (3) these sections would still not bar recovery under Plaintiffs' claim for rescission of contract.

---

[3] In the context of this argument, Defendant's brief quotes language stating "If you are dissatisfied with the site, your sole remedy is to discontinue using the site." Def's Br. at 14 (uppercase in original). This language does not appear in the "Limitation of Liability" section, but rather in the "Disclaimer of Warranties" section. As discussed in detail *supra* § I.D, this statement purported to proscribe a remedy for *breach of warranty*, not breach of contract.

### 1. Exculpatory Clauses Are Unenforceable Against Intentional Wrongdoing

In its analysis of Defendant's purported exculpatory clauses, the Court must "begin with the proposition, too well settled to invoke any dispute, that the law frowns upon contracts intended to exculpate a party from the consequences of his own negligence and though, with certain exceptions, they are enforceable, such agreements are subject to close judicial scrutiny." *Gross v. Sweet*, 49 N.Y.2d 102, 106 (1979). "To the extent that agreements purport to grant exemption for liability for willful or grossly negligent acts they have been viewed as wholly void." *Id.* If there is an ambiguity in the clause, it should be interpreted against the party it purports to exculpate, "especially where it drafted the agreement." *See Goldbaum v. Bank Leumi Trust Co. of N.Y.*, 543 F. Supp. 434, 436-37 (S.D.N.Y. 1982) ("To limit the liability of a defendant on account of his own negligence the language must be explicit, and ... the inference is against that result.") (internal quotations and punctuation omitted). Here, the SAC alleges Defendant's breach was intentional. *See, e.g.,* SAC ¶ 36 ("TheLadders intentionally induced basic members into purchasing paid memberships, but failed to deliver on its promises of performance."). Thus, at the very least, any purported exculpatory clauses must be subject to "close judicial scrutiny," and any ambiguities must be interpreted against the Defendant. Moreover, because Defendant's breach was willful, its purported exculpatory clauses were rendered void. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 n.6 (2d Cir. 2013) (holding exculpatory clauses did not excuse website from intentionally breaching terms of use, stating "an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing") (citing *Kalisch–Jarcho, Inc. v. City of N.Y.*, 58 N.Y.2d 377, 385 (N.Y. 1983)). *See also Deutsche Alt-A Sec. Mortg. Loan Trust, Series…*, __ F. Supp. 2d __, 2013 WL 3863861 at *11 (S.D.N.Y. Jul. 24 2013) (finding exculpatory clause unenforceable where the defendant "willfully knew of material breaches of loans and failed to cure these breaches.").

### 2. The Exculpatory Clauses Were Procedurally And Substantively Unconscionable

Defendant's interpretations of the "Disclaimer of Warranties" and "Limitations of Liabilities" sections of the Agreement would render them unconscionable. "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988) (internal quotations omitted). "[P]rocedural unconscionability concerns the contract formation process, while substantive unconscionability looks to the content of the contract." *Universal Leasing Servs., Inc. v. Flushing Hae Kwan Rest.*, 169 A.D.2d 829, 831 (2d Dep't 1991). Procedural and substantive unconscionability have been described as operating on a "sliding scale," meaning that "the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa." *State v. Wolowitz*, 96 A.D.2d 47, 68 (2d Dep't 1983). "While decisions about unconscionability are for the court to decide as a matter of law, the parties must be afforded a reasonable opportunity to present evidence as to a contract term's commercial setting, purpose and effect to aid the court in making the determination." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 786 (2d Cir. 2003). Nonetheless, Defendant prematurely moves the court to dismiss the case without yet having afforded the parties such an opportunity.

Several factors contribute to the determination of whether a contract clause is procedurally unconscionable. These include "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." *Gillman*, 73 N.Y.2d at 11. Presently, much of the information regarding the formation process is still unknown, given that Plaintiffs have not yet had an opportunity for discovery. But it is clear that the Agreement was a contract of adhesion between

a large company and individuals who were searching for employment. Class members had no alternatives to entering into the Agreement since Defendant's service was unique in that it was the only service purportedly (but deceitfully) selling access to exclusively $100k+ jobs. *See* SAC ¶ 37 (alleging Defendant distinguished itself from its free competitors because "you'll see only real, open $100k+ jobs"). Many premium members were unemployed (or looking for better jobs) and many were likely desperate to improve their situations. Finally, both exculpatory clauses were drafted in "legalese," thus making them incomprehensible to the average member.

The clauses were likewise substantively unconscionable. The inquiry into substantive unconscionability involves an analysis "of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman*, 73 N.Y.2d at 12. Here, both sections, as interpreted by Defendant, absolved Defendant for failing to fulfill its obligations under the Agreement, and stripped Plaintiffs of any remedies. Such a term must be viewed as "unreasonably favorable" to Defendant.

### 3. The Exculpatory Clauses Cannot Prevent Rescission Of The Agreement

Finally, regardless of the meaning of the purported exculpatory clauses, they could not prevent Plaintiffs from recovering damages under their claim for rescission of contract. *See* SAC ¶¶ 138-143.

"[T]o grant rescission is to declare the contract void from its inception and to put or restore the parties to *status quo.* If there was a willful failure or refusal to register which resulted in a failure of consideration or so seriously diminished its value as not to afford the plaintiffs that for which they bargained, then there should be a rescission *in toto* with return of the purchase price." *Schwartz v. Nat'l Computer Corp.*, 42 A.D.2d 123, 125 (1st Dep't 1973). Rescission is appropriate "where the breach is found to be 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980). Here, Defendant breached a

primary contractual obligation to its members, which formed the entire basis of their bargain with Defendant.

Courts in this Circuit and across the nation have uniformly confirmed that exculpatory clauses purporting to limit liability cannot preclude a recovery of damages under a cause of action for rescission. *See BTEC Turbine, LP v. Conn. Light & Power Co.*, 2007 WL 3046257 at *7 (D. Conn. Oct. 17, 2007) (holding allegations "could justify a rescission of the Contract, including the limited liability provision."); *Atlantic Mut. Ins. Co. v. Poseidon Schiffahrt, G.m.b.H.*, 313 F.2d 872, 1963 AM.C. 665, 669 (7th Cir. 1963) ("Had there been … a *contractual limitation* to liability, there is no question about the fact that such limitation would be inoperative here for the deviation was so unreasonable as to permit rescission of the contract. Contract rescission, if allowed, relates back to the agreement in its inception, and causes the contract in its entirety not to have existed.") (emphasis in original); *Flagship West, LLC v. Excel Realty Partners, L.P.*, 758 F. Supp. 2d 1004, 1021 (E.D. Cal. 2010) ("[M]ay a defendant resist an action for rescission by relying on a liquidated damages provision of the contract the plaintiff is seeking to rescind? The answer is equally simple—no"), *rev'd on other grounds,* 2013 WL 3871034 (9th Cir. 2013); *Broadhead Ltd. Partnership v. Goldman, Sachs & Co.*, 2007 WL 951623 at *7 (E.D. Tex. Mar. 26, 2007) (holding "if plaintiff prevails on its claim" then "rescission of the contract, including the liability limitation, will be appropriate.").

Defendant argues that Plaintiffs cannot show that money damages are inadequate. Def's Br. at 16. Defendant cites *Ellington v. Sony/ATV Music Publ'g LLC*, 85 A.D.3d 438, 439 (1st Dep't 2011), a case where the defendant only filed a partial motion to dismiss, for the proposition that rescission is unwarranted where there is "an adequate remedy at law." As an initial matter, this argument is at odds with Defendant's other arguments that Plaintiffs could not obtain damages for Defendant's breach of contract. *See* Def's Br. at 13-15.[4] More importantly,

---

[4] Defendant's argument that Plaintiffs were entitled to cancel their memberships is disingenuous. The Agreement specifically provided that beginning 3 days after payment of fees, subscriptions "may be canceled by You at any

Plaintiffs can plead rescission in the alternative to their breach of contract claims.  In response to the same argument, another court in this District recently noted:

> Here, however, rescissory damages are pled in the alternative to Plaintiff's breach of contract claims. Additionally, whether Plaintiff may seek equitable remedies requires the Court to make factual determinations for which there is no support in the record at this stage…. the issue of rescissory damages is premature.

*Deutsche Alt-A Sec. Mortg. Loan Trust, Series…*, __ F. Supp. 2d __, 2013 WL 3863861 at *10. (S.D.N.Y. Jul. 24, 2013) (internal quotations, citations, and punctuation omitted).  *See also Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 2012 WL 2326068, at *10 (S.D.N.Y. Jun. 20, 2012) (denying plaintiff's request for a ruling on the availability of rescissory damages at the summary judgment stage).  Defendant's arguments must therefore be rejected, at the very least, until the court has a fuller factual record based on which to make such a determination.

## II.    PLAINTIFFS SUFFICIENTLY ALLEGE CLAIMS UNDER THE CONSUMER PROTECTION LAWS

### A.    The Out-Of-State Plaintiffs Have Standing To Assert A GBL § 349 Claim

Defendant argues that Plaintiffs (except Ms. Lynn) do not have standing to assert claims under GBL § 349 because they were "out-of-state residents."  Def's Br. At 17.  But this is at odds with the Second Circuit's recent decision in *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013).  In *Cruz*, the Second Circuit held a Virginia resident had standing to bring a GBL § 349 claim against an online foreign exchange trading website located in New York.  *See* 720 F.3d at 119.  The court examined the language of a decision by the New York Court of Appeals, *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 (2002), which "interpreted the limiting phrase 'in this state' in Section[] 349(a) … to require that 'the transaction in which the consumer is deceived … occur in New York.'"  *Cruz*, 720 F.3d at 122.  After noting that "section 349 was not 'intended to function as a per se bar to out-of-state plaintiffs' claims of deceptive acts leading to transactions within the state,'" the court concluded that the case "clearly involve[d] a series of allegedly deceptive transactions that occurred in New York and implicate[d] the interest of New

---

time but no refund will be made for unused subscription periods."  Addonizio Decl. ¶ 1, Exh. 5 at 4.  Thus, the ability to "cancel" was no remedy at all.

York" because (1) the defendant was "paid in New York"; (2) all customer communications were sent to its New York office; and (3) "[t]he Agreement specifie[d] that New York law goven[ed] all disputes" and "provide[d] that all suits relating to the Agreement [we]re to be adjudicated in the state or federal courts of New York." *Id.* at 123-24.

The applicability of *Cruz* to the present case is clear. Defendant operated entirely out of New York. SAC ¶ 16. Thus, all fees were sent to its New York office. Its website, including the deceptive promises thereon, was operated and maintained in New York. It scraped job postings it knew nothing about from New York. All communications with its members eminated from its New York office. Most importantly, the Agreement provided that it was governed by New York law, and that sole jurisdiction for claims arising thereunder laid with the "state or federal courts within New York State." Addonizio Decl. ¶ 1, Exh. 5 at 5.[5]

Defendant attempts to distinguish *Cruz* by arguing "Plaintiffs were allegedly deceived, applied to jobs and were allegedly harmed in other states." Def's Br. at 18 n.10. That is incorrect. Plaintiffs were harmed in New York despite accessing the website from elsewhere just as Mr. Cruz was harmed in New York despite accessing the defendant's website from Virginia. And the argument that Plaintiffs applied to jobs elsewhere is unavailing since Mr. Cruz traded *foreign* currency (located outside of New York) as well. Separately, the fact that some Plaintiffs also plead the consumer protection statutes of another state on behalf of a particular subclass does not deprive them of standing to assert a GBL § 349 claim on behalf of a nationwide class. Each of the Plaintiffs therefore, have standing to assert GBL § 349 claims.[6]

## B.    Defendant's Statute Of Limitations Arguments Are Wrong

Defendant is wrong that Plaintiffs Morris, Reading, and Wilton's claims under California and Washington law are time-barred. *See* Def's Br. at 23-24. As an initial matter, there is no basis for dismissing these claims regardless of whether the applicable statute of limitations is

---

[5] In the event that the Court requires additional information concerning whether Defendant's allegedly deceptive acts occurred in New York, Plaintiffs request the opportunity to take limited discovery on this issue.
[6] Plaintiffs concede that Ms. Lynn's GBL § 349 claim is time-barred.

three years or four. Under GBL § 349, "a cause of action accrues, triggering commencement of the limitations period, when all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief." *Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 210 (2001). Here, Defendant's website automatically renewed memberships at their expiration, and took money from members' accounts monthly to pay for each consecutive month (or other set period), unless it was instructed otherwise. Plaintiffs thus paid the very fees they seek to recover, in most cases, one month (and sometimes less) prior to the final termination of their memberships. And the statute of limitations was tolled by the filing of the initial nationwide class action complaint in this action on March 11, 2013. Therefore, Plaintiffs Morris, Reading and Wilton's claims are not time-barred. SAC ¶¶ 88, 98, 110. Moreover, Dr. Morris' records show that he paid $75 to Defendant on June 25, 2010, and another $75 to Defendant on September 28, 2010. Without the benefit of fact discovery, there is no basis for dismissal of these Plaintiffs claims based on statutes of limitations.

Furthermore, Defendant's argument that the so-called "borrowing statute" applies to foreign state's consumer protection laws is at odds with its argument that nonresident Plaintiffs lack standing to bring GBL § 349 claims. *Compare* Def's Br. at 17 w*ith* Def's Br. at 23-24. The borrowing statute reads:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y. Civ. Prac. Law § 202 (McKinney's 2013). According to Defendant's argument, however, no "cause of action" ever accrued under the laws of New York for these Plaintiffs. It defies common sense and a plain reading of the statute that Plaintiffs Garcia, Morris, and Reading would be bound by the statute of limitations for a claim they are not entitled to bring.

**C.** **Defendant Violated The Consumer Protection Laws Of New York, California, And Washington As To The Premium Member Plaintiffs**

**1.** **Defendant's Misrepresentations Were Misleading**

Defendant argues its misrepresentations were not misleading. Def's Br. At 19, 25-26. At minimum, that argument raises questions of fact to be fleshed out in discovery. Among other things, the SAC clearly alleges that Defendant promised "only $100k+ jobs" but its service was *not* "only $100k+ jobs." SAC ¶ 1. As such, Plaintiffs allege that Defendant's promise was not only misleading, but also literally false.

Defendant also argues that its promises to "hand-screen," and "pre-screen" all jobs to "ensure" that all jobs were "$100k+" were not misleading. *See* Def's Br. at 19-20. Specifically, Defendant argues that educated guesses as to whether jobs existed or paid $100k+ by its employees fulfilled this promise. *See id.* That is wrong. The definition of the word "ensure" is "to make sure, certain, or safe." *Merriam-Webster Dictionary*, http://www.merriam webster.com/dictionary/ ensure (last accessed August 27, 2013). Thus, a promise to "ensure" something with certainty is very different from promising to perform educated guess work, which amounts to opining about something without having sufficient evidence to support the opinion fully..

New York law uses "an objective definition of deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995).

Likewise, to state a claim under California's Unfair Competition Law ("UCL"), Plaintiffs must allege that Defendant's representations were likely to deceive a reasonable consumer. *See Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). "California courts . . . have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on [a motion to dismiss]." *Id.* at 938. Granting a motion to dismiss a UCL claim is only appropriate in "rare situation[s]," for example when "the advertisement itself

made it *impossible* for the plaintiff to prove that a reasonable consumer was likely to be deceived." *Id.* at 939 (emphasis added)). Even a true representation can be deceptive and thus actionable under the UCL if "couched in such a manner that is likely to mislead or deceive the consumer." *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 332-33 (1998).

Conduct is similarly "unfair or deceptive" under the Washington Consumer Protection Act ("WCPA") when it has the "'capacity to deceive s substantial portion of the public.'" *Search v. Bank of Am.*, 2012 WL 454285 at *4 (W.D. Wash. Oct. 2, 2012). For purposes of the WCPA, "[t]he capacity of a marketing technique to deceive is determined with reference to the least sophisticated consumers among us." *Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257, 1268 (W.D. Wash. 2011).

Here, the proof is self-evident. If reasonable persons truly believed Defendant's representations meant that they would make educated guesses, there would not have been such a widespread public outcry about Defendant's deceptive business practices. *See, e.g.,* SAC ¶ 8 ("upon typing 'the ladders' into Google, the first 'autocomplete' suggestion provided was 'the ladders scam'"). Indeed, even David Manaster, an apologist for Defendant's practices, conceded "[t]here are a lot of people out there with a beef about the actual product at The Ladders, and the sheer volume of complainers gives them authenticity." *Id.* ¶ 7.

Finally, Defendant argues that its representations were "non-actionable puffery." Def's Br. at 20. That is wrong. Statements are not considered puffery if they are "specific and measurable," or if "a reasonable buyer would be justified in relying on [them] in navigating the marketplace." *Time Warner Cable, Inc. v. Directv, Inc.*, 497 F.3d 144, 159-160 (2d Cir. 2007). Here, the promise of "only $100k+ jobs" is specific and measurable – either the jobs exist and pay $100k+ or they don't.[7] Moreover, these promises and representations were the focal point of Defendant's entire sales pitch. Defendant clearly intended for reasonable buyers to rely on them.

---

[7] Defendant's citation to *Fink v. Time Warner Cable*, 837 F. Supp. 2d at 283-83 is inapposite. The representations there, including "always-on connection," "blazing fast speed" and service "up to 3 times" faster, were not specific and measurable, and buyers would not have been justified relying on them.

## 2. Defendant Did Not "Disclose" Its Deceptive Business Practices

Defendant argues that it "fully disclosed" its business practices to its members through (1) a contractual clause it argues was ineffective and "was not part of the agreement to which [Plaintiffs] agreed" (*See* Def's Br. at 6-7); (2) its purported exculpatory clauses (3) a private internet chat between Defendant's customer service representative and a premium member who is not a party to this action; and (4) a speech given by its CEO to alumni of Duke University's MBA program in Los Angeles. *See* Def's Br. at 18-19. These arguments are incorrect.

First, Defendant argues a sentence added to the Agreement in June 2010 "disclosed" to Plaintiffs that Defendant "found some of the posted jobs online." *See* Def's Br. at 18. Defendant argues this, despite previously arguing that this same sentence was ineffective and post-dated Plaintiffs' memberships. *Id.* at 1, 4, 6, 7. Regardless, Defendant does not explain how finding "some of the posted jobs online" discloses that Defendant would make "no good-faith effort to carry out its contractual obligations," and that it would *not* provide "only $100k+ jobs." *See* SAC ¶ 31. At minimum, the question of what constitutes a "$100k+ position" constitutes an issue of fact that cannot be decided at the pleadings stage.

Second, Defendant's exculpatory clauses did not disclose its deceptive business practices for all the reasons stated *supra* §§ I.D-F. Indeed, the only way these clauses could have disclosed such information to Plaintiffs is if they had clearly stated that Defendant's service did *not* provide "only $100k+ jobs," because that is what Defendant represented.[8] Moreover, the Second Circuit has recently held that such exculpatory clauses do not excuse misrepresentations under GBL § 349 as applied to "bad faith conduct." *Cruz v. FXDealer, LLC*, 720 F.3d 115, 123-

---

[8] Defendant's cases are inapposite for this reason. In both cases cited by Defendant, the courts held that defendants made no misleading statements to begin with (even independent of terms of use), and that terms of use explicitly disclosed their business conduct. *See Derbaremdiker v. Applebee's Intern., Inc.*, at *5 Sept. 26, 2012 ("Whether the receipt is considered by itself or together with the full disclosures on the Website and the Official Rules, the receipt was not materially misleading to a reasonable consumer acting reasonably."); *Preira v. Bancorp Bank*, 885 F, Supp. 2d 672, 679 (S.D.N.Y. 2012) (holding defendant had made no misleading statement to begin with, noting the "Complaint thus does not plausibly allege that consumers have been deceived …). Here, Defendant promised "only $100k+ jobs" and did not deliver "only $100k+ jobs." Moreover, the Agreement did not state it would not deliver "only $100k+ jobs," but only had general disclaimers.

124, 124 n.6 (2d Cir. 2013).  *See also Diacakis v. Comcast Corp.*, 2012 WL 43649 at *3 (N.D. Cal. Jan. 9, 2012) (holding that "disclosures in a Service Agreement" do not "necessarily preclude consumer protection claims" under the UCL and WCPA when they are "predicated on collateral representations that differ from contractual language").

Third, Defendant did not "disclose" anything to Plaintiffs from Alishia Frey's Internet chat because none of the Plaintiffs were parties to this third-party chat.  Likewise, Mark Cenedella's admission of scraping jobs made to alumni of Duke University's MBA program in Los Angeles did not disclose anything to Plaintiffs who were not there, are not alumni of Duke University, and did not reside in Los Angeles at the time of his admission.

### 3.     Plaintiffs Allege They Saw Defendant's Misrepresentations

Defendant argues Plaintiffs "fail to identify which ads they specifically saw, where the quotes came from or when they saw them."  Def's Br. at 23.  That is incorrect, as Plaintiffs clearly allege each of these things.  *See* SAC ¶ 66 ("Mr. Garcia entered into the Agreement in reliance on its misrepresentations *in the Agreement* and incorporated therein *on its website*, including …") (emphasis added); *Id.* ¶ 76 (same for Ms. Lynn); *Id.* ¶ 90 (same for Dr. Morris); *Id.* ¶ 100 (same for Mr. Reading); *Id.* ¶ 107 (same for Ms. Ward); *Id.* ¶ 112 (same for Mr. Wilton).  Moreover, Defendant's arguments are legally incorrect.  "With respect to … identification of each advertisement or statement about which each plaintiff is complaining – a general allegation of deception states a claim under GBL § 349."  *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F. Supp. 2d 439, 445 (S.D.N.Y.  2005).  *See also Gaidon v. Guardian Life Insurance Company of America*, 704 N.Y.S.2d 177 (N.Y. 1999) (holding defendant's "extensive marketing schemes" actionable under GBL § 349).  Moreover, "traditional showings of reliance and scienter are not required under GBL § 349."  *Pelman ex rel. Pelman v. Mcdonald's Corp.*, 396 F. Supp. 2d 439, 444 (S.D.N.Y. 2005).   Each of the alleged misrepresentations stated the same thing – that Defendant would provide access to only existing

$100k+ jobs.[9]  Finally, Defendant argues that "any ads distributed after Plaintiffs became

Premium Members could not have induced them to join the website."  Def's Br. at 29.  But this

is incorrect.  Defendant's service automatically renewed Plaintiffs' subscriptions periodically.

Plaintiffs were thus harmed by all ads shown on its website up to their final auto-renewal

sessions – usually one month (or less) before the end of their memberships.

## III.    DEFENDANT FRAUDULENTLY INDUCED THE RESUME PLAINTIFFS INTO PURCHASING RESUME REWRITING SERVICES

Plaintiffs Garcia, Lynn, and Morris also assert claims for fraud and violations of the

WCPA and GBL § 349 on behalf of a class of persons who were fraudulently induced by

Defendant to purchase unnecessary resume rewriting services.  *See* SAC ¶¶ 161-167, 174, 183.

These allegations stem from Defendant's so-called "expert resume critique" which it sent to each

premium member that signed up for its service.  *Id.* ¶ 48.  Plaintiffs allege these critiques were

actually form letters that advised members (whether true or false) that their resumes were

plagued with problems in order to induce them into purchasing unnecessary resume rewriting

services.  *Id.* ¶ 51.  The form letters were drafted by salespeople who often had no experience in

the field of resume consulting.  *Id.* ¶ 52.  These salespeople were paid on commission, making

exactly $10 for each person they can sell into purchasing rewrites.  *Id.*  Because they were paid

nothing for the letters written to people who did not receive rewrites, they were strongly

incentivized to heavily criticize members' resumes, whether or no criticism was warranted.  *Id.*

Defendant's salespeople used a crib-sheet with instructions on drafting these form letters.

*Id.* ¶ 54.  The SAC includes instructions from one version of the crib-sheet which instructed the

salespeople on how to close the deal if the "client need[ed] convincing of out qualifications."  *Id.*

¶ 56.  In such a scenario, Defendant instructed its salespeople to lie to members by stating "I am

a TERRIBLE sales person!! I'm a writer and analyst."  *Id.*  These instructions show a clear intent

---

[9] The facts of *Gale v. Int'l Bus. Machs. Corp.*, 9 A.D.3d 446, 447 (2d Dep't 2004) are inapposite.  While the *Gale* plaintiff "did not see any of the[] statements," 9 A.D. 3d at 447, each of the present Plaintiffs allege they "carefully reviewed the contents of www.theladders.com, including … the above-referenced misrepresentations."  *See* SAC ¶¶ 66, 76, 90, 100, 107, 112.

on the part of Defendant that members would rely on the nonexistent qualifications of the people drafting their resume critiques in deciding whether to purchase resume rewriting services.

Plaintiffs and other class members caught Defendant red-handed. For example, Defendant sent a critique in response to a resume written by Susan Geary, a professional resume writer who had previously provided resume rewriting services for Defendant. *See* SAC ¶ 63. When she compared the form letter she received with those received by other professional resume writers, she found that they all contained the same boiler-plate, incorrect criticisms. *Id.* Moreover, Plaintiff Morris, after being misled into purchasing a rewritten resume from Defendant, submitted Defendant's rewritten resume to Defendant's "experts" who sent back another form letter advising him that it "needed a great deal of work" and that he should consider engaging Defendant to rewrite it. *Id.* ¶ 95.

Defendant made material misrepresentations to Plaintiffs Lynn, Morris, and Garcia by giving inapplicable criticism to their resumes, and by misrepresenting the "expert" status of the salespeople who "critiqued" them. *Id.* ¶ 163.[10] Further, it made material omissions by failing to disclose they were written by salespeople working on commission with no experience, and working off a crib-sheet. *Id.* ¶ 164.[11]

---

[10] Defendant's argument that the term "expert resume critique" is mere puffery is incorrect. *See* Def's Br. at 21. Where a party reasonably relies on another party's advice because they were misled in believing they were an expert, such a misrepresentation cannot be considered puffery. *See Federal Ins. Co. v. Mallardi*, 696 F. Supp. 875, 881 (S.D.N.Y. 1988) ("[a] broker's misrepresentation of his status is actionable where, as here, it goes to the investment's quality, i.e. where the plaintiffs' investment decision was based on the broker's recommendations, which the clients would not have accepted had they known the true nature of the broker's expertise."). Defendant's citations are inapposite because they deal uniformly with situations where parties relied on claims of expertise in engaging other parties – not in accepting expert advice. *See Welch v. TD Ameritrade Holding Corp.*, 2009 WL 2356131 (S.D.N.Y. Jul. 27, 2009); *Gabaayzadeh v. Brafman*, 2010 WL 6620688 (S.D.N.Y. Jun. 18, 2010); *Highlands Ins. Co. v. PRG Brokerage, Inc.*, 2004 WL 35439 (S.D.N.Y. Jan. 6, 2004); *Cook, Perkiss, & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242 (9th Cir. 1990).

[11] Defendant's argument that it had no duty to disclose information is meritless. *See* Def's Br. at 28 n.19. "Fraud can also be effected by concealment even in the absence of a fiduciary relationship where (1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Sudul v. Computer Outsourcing Services, Inc.*, 917 F. Supp. 1033, 1043 (S.D.N.Y. 1996). These factors are all clearly alleged in the SAC.

Defendant makes several incorrect arguments with regard to the Resume Plaintiffs. First Defendant argues "the Resume Plaintiffs actually received real critiques," and that despite not being written by experts, they contained "highly relevant and useful criticisms." Def's Br. at 27, 22. Aside from being irrelevant, these are issues of fact for the jury. *See Roth v. Jennings*, 489 F.3d 499, 501 (2d Cir. 2007) (the court must accept allegations as true).[12] Second, Defendant argues it disclaimed any promises "about the quality of its resume rewriting services and critique services." Def's Br. at 27. This is not true. Defendant provides no citation as to where it purportedly disclaimed the accuracy of the criticism in its resume critiques. Regardless, Plaintiffs' claims were for fraudulent inducement into a contract. Not breach of contract. Defendant incorrectly argues Plaintiffs' allegations fail to satisfy the requirements of a claim for fraud under Rule 9(b). Def's Br. at 27-29. The requirements are: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir. 2007).

Plaintiffs' allegations satisfy the heightened pleading standard because they are sufficiently precise to allow Defendant to understand the nature of the allegations and to frame a responsive pleading. These allegations identify Defendant's fraudulent misrepresentations, where and when the misrepresentations were made, and they explain why they are false.

For example, Defendant argues Plaintiffs fail to provide detail as to its misrepresentations.[13] Def's Br. at 27-28. That is wrong. Plaintiff Garcia received his deceiving form letter on November 29, 2007. SAC ¶ 68. Plaintiff Lynn did shortly prior to July 2009. *Id.* ¶ 84. Plaintiff Morris received his on March 29, 2010. *Id.* ¶ 93. These form letters were all

---

[12] Defendant has attached cherry-picked documents in furtherance of its arguments. For example, Defendant attached Dr. Morris' first resume critique, but failed to attach his second one where Defendant criticized its own rewritten resume. Moreover, Defendant has not attached a copy of the crib-sheets it used during the applicable period. Ultimately, a determination cannot be made on the quality of the critiques without a fuller factual record.

[13] Defendant's arguments seemingly misconstrue Plaintiffs' allegations which allege they were misled by the purported resume critiques, not external advertisements, into purchasing resume rewriting services.

written by Defendant, sent to Plaintiffs via email, and thereafter, attached to Defendant's motion. *See* Exhs. 9-11. Further, Plaintiffs were told they would receive "expert resume critiques" on Defendant's website at the time they became premium members. These dates are alleged in the SAC, and memorialized in Defendant's own billing records. An exemplar of this misrepresentation is also displayed in Paragraph 41 of the SAC.

Defendant also argues Plaintiffs fail to allege scienter.[14] Def's Br. at 28. That is incorrect. "Rule 9(b) permits malice, intent, knowledge, and other condition of mind to be averred generally. In this regard … it would be unworkable and unfair to require great specificity in pleading scienter, since a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988) (internal citations, quotations, and punctuation omitted). Here, the SAC contains a remarkable state of specificity, including that Defendant employed unqualified salespeople who worked on commission for $10 per resume order. *See* SAC ¶ 52. The SAC also details how the salespeople used a crib-sheet, and even quotes an excerpt from the sheet encouraging them to lie in order to sell resume rewrites. *See id.* ¶ 56.

Finally, Defendant argues that Plaintiffs have not pled reasonable reliance. Def's Br. at 29. Defendant argues Plaintiffs "do not allege which specific ads touting the free resume critique service they personally saw." *Id.* But this is irrelevant. Plaintiffs were misled by the resume critiques, not by ads touting them. And Plaintiffs allege they relied on the critiques in purchasing resume rewriting services:

> The form letter sent to Mr. Garcia was material to his decision to contract with TheLadders for its resume rewriting services. Mr. Garcia would not have contracted with TheLadders for its resume rewriting services if he had known that he received a mere form letter based on a crib-sheet rather than a bona fide "expert resume critique" as promised, and that the "expert" who drafted his "expert resume critique" was not an expert at all.

*See* SAC ¶ 70. *See also id.* ¶ 84 (same for Ms. Lynn); *id.* ¶ 93 (same for Dr. Morris).

---

[14] "[T]raditional showings of reliance and scienter are not required under GBL § 349." *Pelman ex rel. Pelman v. Mcdonald's Corp.*, 396 F. Supp. 2d 439, 444 (S.D.N.Y. 2005).

## IV.    PLAINTIFFS STATE CLAIMS FOR UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED

Finally, Defendant argues Plaintiffs' claims for unjust enrichment and money had and received fail because "there is an enforceable written contract."  Def's Br. at 16.  But Defendant argues its promises were not incorporated into the Agreement.  *See* Def's Br. at 11-12.  "When there is a bona fide dispute as to the existence of a contract, a party may proceed upon a theory of unjust enrichment and an unjust enrichment claim may be alleged alongside a breach of contract claim."  *Picture Patents, LLC v. Earopostale, Inc.*, 2009 WL 2569121 at *3 (S.D.N.Y. 2009).  Moreover, the claims of the Resume Plaintiffs do not lie in breach of contract.  *See id.* (claim for unjust enrichment can "succeed if the party alleges a wrong that is distinct from any contractual obligations.") (internal quotations and citations omitted).

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss in its entirety.  Should the Court find dismissal of any claims warranted, Plaintiffs seek leave to amend the Complaint.  "Fed. R. Civ. P. 15(a) requires that leave to amend shall be freely given when justice so requires."  *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (internal quotations and alterations omitted).  "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."  *Id.* (internal quotations omitted); *see also Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 252-53 (2d Cir. 1991) (remanding where plaintiff, faced with the Eleventh Amendment immunities of the named defendants, had requested leave to re-plead claims against the defendants in their personal capacities). In addition, "[c]omplaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend."  *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986).


Dated:  September 4, 2013

Respectfully submitted,


By:     */s/ Joseph I. Marchese*
            Joseph I. Marchese

**BURSOR & FISHER, P.A.**
Scott A. Bursor (SB1141)
Joseph I. Marchese (JM1976)
Neal J. Deckant (ND1984)
Yitzchak Kopel
888 Seventh Ave
New York, NY 10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
            jmarchese@bursor.com
            ndeckant@bursor.com
            ykopel@bursor.com

*Attorneys for Plaintiffs*